J-A19031-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: D.R.H., A MINOR | : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.M.C., MOTHER | : | No. 330 MDA 2024 |

Appeal from the Order Entered February 5, 2024
In the Court of Common Pleas of Luzerne County Orphans' Court at
No(s):  A-9315

| | | |
|---|---|---|
| IN THE INTEREST OF: A.L.C., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.M.C., MOTHER | : | No. 331 MDA 2024 |

Appeal from the Order Entered February 5, 2024
In the Court of Common Pleas of Luzerne County Orphans' Court at
No(s):  A-9316

BEFORE:    PANELLA, P.J.E., STABILE, J., and LANE, J.

MEMORANDUM BY LANE, J.:                     **FILED NOVEMBER 05, 2024**

S.M.C. ("Mother") appeals from the orders imposed terminating her parental rights to her children, D.R.H. and A.L.C. (collectively "the Children"). We affirm.

D.R.H. was born in April 2015 and A.L.C. was born in August 2017.[1] The record does not indicate that Mother was living with either of the Children's

---

[1] Mother also has two older children, aged ten and eleven, who "have been in the care of their fathers or other relatives since 2013 or 2014."  Trial Court Opinion, 4/5/24, at 12.

fathers. In October 2019, police arrested Mother at her home for possession of suspected heroin and/or fentanyl. There was a gun in the residence, and Mother admitted that she and a man sold drugs out of the residence. D.R.H., who was then four years old, and A.L.C., then two years old, were "present in the home at the time of the incident and were taken into protective custody by" Luzerne County Children and Youth Services ("CYS"). Trial Court Opinion, 4/5/24, at 3. Since that time, the Children have been placed with the same foster family, and "[a]s a result of the criminal incident, the [C]hildren were adjudicated dependent." *Id*. at 6. Mother was incarcerated for five to six weeks, and in January of 2023, pleaded guilty to possession with intent to deliver a controlled substance and possession of a controlled substance. At some point, Mother was placed on probation.

Meanwhile, the trial court summarized:

[CYS] developed a Family Service Plan . . . which was adopted by the court as part of an order. Mother was ordered to engage in parenting education, obtain and maintain safe and stable housing, participate in a mental health evaluation and follow recommendations, participate in a substance abuse evaluation and follow treatment recommendations, and comply with the "color call in system[."] The "color call in system" assigns a particular color to Mother and she is required to phone [CYS] daily and submit to [drug] testing should her color be called on that day. [CYS] explained the services and the plan to Mother and made it clear . . . that she needed to complete the services and be compliant in order for her to be unified with her children. [N.T., 3/6/23, at 32.]

- 2 -

[CYS Caseworker Cindy Jones ("Jones")[2]] testified [to the following. CYS] provided Mother with caseworker counseling and made the appropriate referrals to service providers, in addition to providing transportation passes. . . . Mother successfully completed parenting education through Justice Works [in April] 2022 and obtained stable housing in May 2021. . . . Mother complied with a mental health evaluation and was not recommended for any services. . . . Mother also completed an outpatient substance-abuse treatment program at the Robinson Counseling Center [in November] 2021. However, due to Mother continuing to test positive for fentanyl, [she] was referred for another substance abuse evaluation [in January] 2022. Mother did not participate in that evaluation. [*Id*. at 33.]

Trial Court Opinion, 4/5/24, at 6-7.

With respect to the parenting classes requirement:

Jones was questioned upon cross examination regarding the number of times Mother completed a course in parenting education. Jones responded that Mother completed a parenting program while she was incarcerated. . . . Mother was also referred to the Family Services Association sponsored "Intensive Family Reunification Program[." H]owever, Mother was unsuccessful in completing the program[ because] there was a concern regarding [her] continued positive test results indicating use of illegal substances. Jones stated that Mother often used foul language and was not receptive to learning in the program. [N.T., 3/6/23, at 40.]

*Id*. at 12.

With respect to drug testing, Jones testified that from May 2021, when the trial court ordered Mother to comply with the "color call in system," until the termination hearing in March 2023, Mother should have submitted to approximately 150 drug screens. However, CYS presented the testimony of

---

[2] In quoting the trial court opinion, we have amended its references to "Ms. Jones" with "Jones."

George Hockenbury, the toxicologist who tested sixty-two urine samples provided by Mother. Forty-nine samples were positive for illegal substances, frequently fentanyl. *See* N.T., 3/6/23, at 8, 10. Jones testified that since September 2022, Mother had not participated in the "color call in system."[3] *Id*. at 34, 53.

We reiterate that CYS took the Children into protective custody in October 2019. Jones testified that from December 2019 to September 2020, Mother did not maintain contact with CYS, and accordingly had no visits with the Children. *See id*. at 37. CYS had two telephone numbers for Mother but was unsuccessful in contacting her. Jones acknowledged that this period overlapped with the COVID-19 pandemic, but stated CYS offered video visits to all parents with children in foster care. *See id*. at 42. Following the January 2023 hearing, CYS' contact with Mother "became more consistent." *Id*. at 37. Nevertheless, visits with the Children had not "progressed past supervised visits." *Id*. at 51.

On May 2, 2022, CYS filed the underlying petitions to terminate Mother's rights to D.R.H. and A.L.C.[4] At this time, the Children had been in placement

---

[3] Jones noted that at the January 2023 permanency hearing, the trial court directed Mother to submit to a drug test the following day, she complied, and the result was negative. *See* N.T., 3/6/23, at 34-35. However, aside from this drug test, Mother did not submit to any CYS drug screens after September 2022.

[4] Meanwhile, in February 2022, A.L.C.'s father, E.G.C., voluntarily relinquished his parental rights. CYS also filed a petition to confirm his consent to the adoption of A.L.C., and the trial court granted it. Meanwhile, CYS also filed a

for two and a half years. CYS was not able to serve the petition on Mother, *via* her counsel, until September 2022. **See** N.T., 3/6/23, at 94. The trial court conducted several hearings from August 2022 through January 2024.[5] CYS Caseworker Jones testified consistently with the above factual summary. The Children's guardian *ad litem* ("GAL"), who represented both Children's bests interest and legal interests, appeared and examined the witnesses. The Children's "Court Appointed Special Advocate" ("CASA"), Pamela Coburn,[6] also testified.

Mother, represented by counsel, testified to the following at the March 6, 2023, hearing:

> Mother admitted that she was using illegal substances and that she pleaded guilty to selling illegal substances[, but] claimed that the reason she was selling illegal substances was to continue . . . her own substance use. Mother also admitted that she was taking illegal substances in her home with the [C]hildren present. [N.T., 3/6/23, at 70. D]ue to the charges filed against her, . . .

---

petition to terminate the parental rights of D.R.H.'s father, D.H. He died in April 2023. **See** Trial Court Opinion, 4/5/24, at 1.

[5] At the hearings, the parties referred to an additional hearing, held on October 21, 2022, on a motion for contempt filed by Mother. **See** N.T., 1/26/23, at 14. Mother included a copy of the transcript for this hearing in her reproduced record. She also included copies of the October 27, 2022 trial court orders resulting from this hearing — which directed, *inter alia*, that: (1) supervised visits begin immediately at VisionQuest's facility; and (2) additionally, Mother have video contact with the Children at least two nights during the week. However, neither the certified records, at each child's case, nor the corresponding trial dockets, include Mother's contempt petitions, the hearing transcript, or the trial court orders.

[6] The notes of testimony show Coburn's name as spelled both "Coburn" and "Cobern." **See** N.T., 1/26/23, at 4; **see also** N.T., 4/10/23, at 20. For ease of review, we adopt the spelling set forth in the trial court opinion.

she was in jail for five . . . to six . . . weeks prior to posting bail. [W]hile she was incarcerated, [Mother] completed a parenting education program. [W]hen she was released from jail, she went to [CYS'] office the following day. [*Id*.]

* * * *

Mother alleged that she completed a total of three [different] parenting education classes and that, contrary to Jones' testimony, she did successfully complete the second parenting program. *Id*. at 72-73. . . .

Trial Court Opinion, 5/4/24, at 15-16.

The trial court summarized Mother's additional testimony:

Mother . . . claimed [that] at the time of the hearing on March 6, 2023, she had a two-bedroom apartment for two years to accommodate [the Children. N.T., 3/6/23, at] 73. Mother testified that she also voluntarily engaged in therapy . . . at "Omni[."] H]owever, she missed too many appointments[ and was] therefore[] required to wait thirty . . . days [to] schedule an appointment. *Id*. at 75.

Mother stated that she also engaged in substance abuse evaluations and followed the treatment recommendations. Mother indicated that [since at least November 2021,] she was currently in counseling at the Robin[son] Counseling Center . . .. *Id*.

*Id*. at 16-17.

At this juncture, we note that at the same hearing, Jones testified that she "attempted to contact Robinson Counseling Center regarding Mother's compliance; however, the agent at the Center was not able to confirm nor deny whether Mother had been receiving treatment. Jones believed that Mother had not been attending counseling at the Center." *Id*. at 12-13 (*citing* N.T., 3/6/23, at 41). Subsequently, in December 2023, Mother signed

releases for CYS to obtain information from Robinson Counseling Center. *See* N.T., 1/11/24, at 52-53.

Mother also testified that she requested the Children's medical and school records, as well as notice of their medical appointments.[7] "[H]owever, she was refused." Trial Court Opinion, 4/5/24, at 17 (*citing* N.T., 3/6/23, at 78-79). With respect to visits with the Children,

> Mother stated that [CYS] advised her that visits would be set up with the [C]hildren. [However,] she only had one visit and [CYS] stopped returning her calls due to the [COVID-19] pandemic. Mother claimed that [CYS'] office was closed. [H]er family and the [C]hildren's fathers [called, and the Children's] paternal grandmother [called] in order to see the [C]hildren. [W]hen [Mother] discovered that [CYS'] office reopened, she was told that her caseworker was changed, and that was the reason her calls were not returned. *Id*. [at] 71-72. . . .

Trial Court Opinion, 4/5/24, at 16.

> Mother claimed that after the [COVID-19] pandemic, she [had] supervised visits with [the Children] on a weekly basis for approximately one year. These visits were supervised by Justice Works. [N.T., 3/6/23, at 79. D]uring the supervised visits, [Mother] took the [C]hildren to the Crayola Factory, snow tubing, a trampoline facility, the movies, roller skating, and arts and crafts at Mother's apartment [*sic*]. *Id*. at 80.

*Id*. at 17 (quotation marks omitted).

With respect to the "color call in system" for drug testing with CYS, Mother maintained she had "a stack of papers" showing she did appear for testing many times, but there was no "referral slip" for her and thus she could

---

[7] D.R.H. has glaucoma and cataracts and wears glasses. *See* N.T., 1/26/23, at 11.

not submit a test. N.T., 3/6/23, at 84. Mother also testified that she sent a photograph of herself at the testing center to her attorney and to CYS, to prove that she was there; however, she did not submit this photograph into evidence. *See id*. Mother explained that after she "lost [her] car," transportation was difficult, CYS did not provide her with bus passes until a few weeks before the March 2023 hearing, and often she arrived too late at the drug testing site, due to her job and having to take multiple buses. *Id*. at 84-85.

Mother further testified to the following. She participated in an intensive, daily drug reporting program through probation and the criminal court. *See id*. at 81. The program required Mother to check in daily and submit to drug testing up to three times weekly. *See id*. Mother often submitted to drug testing with probation in the morning, obtaining a negative result, but later that same day, had a positive result with CYS' "color call in system." Mother testified that she had a list of the dates when this occurred, but she gave this list to a previous CYS caseworker. *See id*. at 94. Mother opined that many of her "positive" CYS drug results were in fact "false," and she denied testing positive on sixty occasions, claiming "at the most" it was three times. *Id*. at 83. When asked why she might produce different drug results on the same day, Mother replied that she may have touched tainted money which skewed the drug screen results, but she also did not know whether that could happen. *See id*. at 83. Meanwhile, Hockenbury, the

- 8 -

toxicologist, testified that that drug testing specimens are sealed in tamper-proof bags, and none of Mother's samples appeared tampered with. *See id*. at 14, 16. Finally, Mother testified that the probation department did test for fentanyl. *See id*. at 82, 92-93.

At this juncture, we note that Jones acknowledged "[t]here were several times" when Mother appeared for testing for the "color call in system," but there was no "referral for her." *Id*. at 42-43. Jones also testified as to her belief that the probation department did not test for fentanyl "unless specifically requested." *Id*. at 46. Jones contacted the probation department and left messages for Mother's probation officer, inquiring of Mother's compliance with her probation terms and drug testing. *See id*. at 36. However, Jones did not receive a response.

Additionally, the trial court summarized:

> Jones testified that Mother requested to participate in the Gaudenzia residential program which is an inpatient substance-abuse program permitting women and their children to reside together in the Guadenzia home while undergoing treatment. Jones stated that she at first had believed that Mother wanted to participate in the program because she desired inpatient treatment; however, Jones claimed that Mother wished to participate in the program only to be reunited with her children. Jones believed that Mother needed at first to remedy her substance abuse issue so that she could reunite with her children.

Trial Court Opinion, 4/5/24, at 11. In sum, according to Jones, Mother had not resolved the "main issue," which was her "continuing positive tests for fentanyl and not reengaging in drug and alcohol treatment." *Id*. at 10; *see also* N.T., 3/6/23, at 34.

Mother, on the other hand, testified to the following:

[S]he had not been using any illegal substances, but admitted that she was an addict, and that she could be clean one day and "mess up the next." [N.T., 3/6/23, at 87.] Mother [had] a long-term struggle and living in the Gaudenzia home is the best decision for her family wherein she could have her children with her and work on her recovery. *Id*.

Trial Court Opinion, 5/4/24, at 18-19. The GAL asked Mother whether, before she learned of Gaudenzia, she believed she needed an inpatient program. *See* N.T., 3/6/23, at 97. Mother responded:

I was in outpatient, and . . . I've kept my addiction under control. I struggle. I have temptations. But outpatient wasn't really a good fit for me. . . . I have a home and bills and keeping up with my visits and my services [*sic*]. And outpatient or inpatient by myself, it just wouldn't work.

*Id*. However, Mother believed that she and the Children would benefit from the Gaudenzia program.

The trial court conducted the next hearing, on April 10, 2023, to hear evidence concerning the Children's best interests. *See* N.T., 4/10/23, at 8. Mother did not attend this hearing, although her counsel appeared. The parties believed that Mother had entered a twenty-eight-day drug rehabilitation program. *See id*. at 4. Jones testified that she has observed one interaction between Mother and Children, which was "prior to a hearing outside the courtroom." *Id*. at 8-9. Jones believed that the Children "are familiar with," enjoy seeing, and love Mother, but Jones would not describe their bond as one of parent/child because Mother "has not been consistent in performing parental duties for the majority of [the Children's] lifetime." *Id*.

- 10 -

at 9. On cross-examination, Jones agreed with Mother's counsel that at another hearing, the trial judge gave the Children small gifts, it was Mother who "reminded them to say thank you," and at that moment, the Children looked to Mother for guidance — and not their foster mother. *Id*. at 12. When asked why the Children would do so if they were not bonded with Mother, Jones responded: "The [Children] are familiar with [Mother]. I believe[ the Children] would take direction like that from me if I told them to say thank you." *Id*. at 13.

On the other hand, Jones testified that the foster parents wished to adopt the Children, and Jones did not have any concerns with the foster parents.

> Jones described the bond between the foster parents and the [C]hildren as a parent/child bond. Jones described the children as being very accustomed in their home, and the [C]hildren further stated to her that they wish to reside with the foster parents. Jones indicated that the bond is reciprocated by the [C]hildren. . . .

Trial Court Opinion, 5/4/24, at 24. Jones opined that termination of Mother's parental rights would not cause the Children any negative or detrimental effects, but rather would have a positive impact as the Children "would be free for adoption, and they would achieve permanency." N.T., 4/10/23, at 9.

Coburn, the Children's CASA, testified she has visited the Children in their foster home, at the CASA clubhouse, and in the community. Coburn described the Children as happy, engaged, and positive. *See id*. at 20, 22. Both D.R.H. and A.L.C. told Coburn they would like to stay in the foster home,

- 11 -

and A.L.C. further stated she did not remember Mother. *See id*. at 21. Before one hearing, in the hall outside the courtroom, Coburn observed Mother read books with the Children, and "[i]t was [a] very positive, kind interaction." *Id*. at 22-23. Nevertheless, Coburn recommended that the Children be adopted. *See id*. at 24.

Mother appeared at the next hearing on January 11, 2024 and gave the following testimony concerning the Children's best interests. In the recent months, Mother had video chats with the Children, which were "[w]onderful, joyful, [and] happy." N.T., 1/11/24, at 11-12.[8] However, no one had contacted Mother regarding supervised visits with Justice Works. *See id*. at 11. Nevertheless, Mother regularly went to the Children's school bus stop to see them. *See id*. at 16. Mother stated that she is bonded with the Children, and they to her, and they tell each other that they love each other. Mother stated it was in the Children's best interests to have contact with her. With respect to drug treatment, Mother testified that she was "on maintenance," and attended weekly drug and alcohol counseling, mental health counseling, as well as a women's "NA meeting." *Id*.

Mother called Denise Nirka ("Grandmother"), the paternal grandmother of D.R.H., who testified to the following. She lived in Missouri. When the

---

[8] There are two volumes of testimony for January 11, 2024. In the first volume, the trial court heard *in camera* testimony from D.R.H. We will cite this transcript as "N.T. *In Camera*, 1/11/24." The second transcript included the testimony of the remaining witnesses. We cite that volume as "N.T., 1/11/24."

Children "were babies," she sued Mother for custody and had custody of the Children for a year and two months. *Id*. at 31. Mother averred Grandmother could be a placement resource for the Children, but the trial court agreed such argument was not relevant to the issue at that hearing — which was the Children's best interest. *See id*. at 34.

Jeanie Zaykowski, who supervised the Children's CASA plan and "spent prolonged periods with them," testified, as Cobern was unavailable to attend the hearing.

> Zaykowski[9] related that it was Coburn's recommendation that both [C]hildren remain with the foster parents. Coburn recommended that [Mother's] parental rights be terminated and that the [C]hildren be free for adoption by the foster parents. According to Zaykowski, Coburn did not believe there should be any further communication between [G]randmother and the [C]hildren since it was causing extreme distress and was detrimental to the [C]hildren's well-being. In the event any communication was permitted to continue . . . Coburn recommended that such communication be supervised. Coburn also recommended that any visits between Mother and the Children . . . be supervised. *Id*. at 46-47.

Trial Court Opinion, 5/4/24, at 25-26 (footnote added).

On the same day, the trial court also heard the following *in camera* testimony from D.R.H., who was then eight years old. D.R.H. wished to tell the trial judge that she wanted to live with her foster mother. *See* N.T. *In Camera*, 1/11/24, at 6. D.R.H. calls her foster parents "Mommy" and "Daddy." *Id*. at 14. The day before, D.R.H. asked her foster mother whether, if the

---

[9] In quoting the trial court opinion, we have amended its references to "Ms. Zaykowski" and "Ms. Coburn" with "Zaykowski" and "Coburn."

foster mother adopted her, D.R.H. could still see Mother. *See id*. at 6. The foster mother replied that when D.R.H. becomes a teenager and obtains a driver's license, she could visit Mother and then "come back home." *Id*. D.R.H. loved Mother as much as she loved her foster mother, but D.R.H. wished more to live with her foster mother. *See id*. at 7. D.R.H. was afraid to tell Mother because she did not want Mother to feel sad. *See id*. at 10.

On February 5, 2024, the trial court issued the underlying decrees terminating Mother's parental rights to the Children, finding CYS established grounds for termination under 23 Pa.C.S.A. § 2511(a)(2), (a)(8), and (b). At this time, D.R.H. was nine years old, A.L.C. was six, and the Children had been in placement for four years and three months.

Mother timely filed separate notices of appeal at each child's docket, along with Pa.R.A.P. 1925(a)(2) concise statements of errors complained of on appeal. This Court *sua sponte* consolidated the appeals.

Mother raises the following issues for our review:

[1.] Whether the [trial] court abused its discretion by finding that [CYS] established grounds for termination of parental rights by clear and convincing evidence under 23 Pa.C.S.A. § 2511(a)(2) and § 2511(a)(8)?

[2.] Whether the [trial] court erred and abused its discretion in finding that [CYS] established termination of parental rights was in the best interest of the [Children] as required by 23 Pa.C.S.A. § 2511(b)?

Mother's Brief at 8 (some punctuation added).

In her first issue, Mother argues the trial court erred in terminating her parental rights under subsections 2511(a)(2) and (8). Under the relevant standard of review, we:

> accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. [A]n abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.
>
> . . . [U]nlike trial courts, appellate courts are not equipped to make fact-specific determinations on a cold record, where trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead, we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*Interest of K.T.*, ___ A.3d ___, ___, 2024 WL 4194774 at *5 (Pa. Super. 2024) (citations omitted). This Court has explained:

> Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis:
>
> > Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [section] 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [section] 2511(b):

- 15 -

determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

"The standard of 'clear and convincing' evidence is defined as testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." Finally, this Court need only agree with the orphans' court as to "any one subsection of [section] 2511(a), in addition to [section] 2511(b), in order to affirm the termination of parental rights."

*Id*. (citations and unnecessary capitalization omitted).

Subsection 2511(a)(2) provides that a trial court may terminate parental rights when:

[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2). Under this subsection, the petitioner must show:

(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

Grounds for termination "are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." Further, "[p]arents are required to make diligent efforts toward the **reasonably prompt** assumption of full parental duties."

*Interest of K.T.*, \_\_\_ A.3d at \_\_\_, 2024 WL 4194774 at *6 (citations omitted and emphasis in original).

Mother argues the trial court erred and abused its discretion in finding CYS established grounds for termination under subsections 2511(a)(2) and (a)(8).  Mother maintains that she "worked hard and made numerous steps toward[]" reunification but "was met with resistance from" CYS.  Mother's Brief at 14-15.  Mother maintains that "[f]rom the outset it seemed as if [CYS] had decided to pursue adoption through the foster mother, giving only lip service to Mother [and] her efforts."  *Id*. at 17 (unnecessary capitalization omitted).  In support, Mother contends that CYS: (1) refused to schedule visits with the Children, as well as drug testing, at times that aligned with her schedule; (2) misinformed her that a hearing was cancelled, causing her to miss it; (3) "refused to accept her completion of multiple parenting programs[ and] regularly making her retake them;" and (4) discontinued visits in her home "on the basis of phantom reports of undesirable persons being present at her home."  *Id*. at 15.  Mother asserts that CYS' actions were not in the Children's best interests but "were designed to keep [her] separate from the [C]hildren."  *Id*. at 16.  Mother also maintains she passed "all" of the probation department's drug tests — which CYS knew — yet CYS failed to explain why her "color call in system" drug screens were positive.  *Id*. at 15-16.

Mother further alleges the prior CYS caseworker and supervisor were removed from her case following a October 2022 contempt hearing, and the

trial court reinstated supervised visits at Vision Quest "with the provision that as soon as [the] Concern [agency] was available to supervise in the community, the visits should transfer to Mother's home or the community." *Id*. at 16-17. However, Mother claims, she "never received another home or community visit with" the Children." *Id*. at 17.

Mother acknowledges that "[p]rior to her arrest, [she] had a problem with addiction which led to the" Children's placement. *Id*. However, Mother asserts she has achieved "continued and long-lasting victory over [her] addiction." *Id*. Mother also avers she identified a rehabilitation center that would have permitted her and the Children to attend together and receive joint counseling, but "this option was not considered." *Id*. Finally, Mother avers one of the Children's paternal grandmothers was a foster parent in Luzerne County and had another child placed with her, yet "she was never considered a resource for the [C]hildren." *Id*.

In ruling on CYS' termination petitions, the trial court considered Jones' testimony that Mother completed a parenting class, and mental health and drug and alcohol evaluations. Saliently, however, the trial court found that "Mother had not addressed the issues which gave rise to the [C]hildren's placement, mainly her substance abuse issue." Trial Court Opinion, 5/4/24, at 10. The trial court cited the testimony that following the implementation of the family service plan, "Mother continued to test positive for fentanyl and she did not re-engage in substance-abuse treatment." *Id*. Despite Mother's

requirement to participate in the "color call in system," she submitted to only sixty-two drug screens out of the approximately one hundred and fifty required screens. *See id*. Of her sixty-two drug screens, forty-nine had a positive result. *See id*. at 7. Additionally, although Mother was still required to participate in the "color call in system" as of the March 2023 hearing, she failed to comply after September 2022.[10] *See id*. at 10. The trial court considered Mother's testimony that she often appeared for the "color call in system" but could not be tested, but observed that she did not provide any supporting documentation, including her alleged "stack of papers." *Id*. at 18. Furthermore, the court reasoned, even if Mother's claim were true, it would not negate the forty-nine positive results. To this end, the court also specifically found Mother's testimony — that the positive results were "false," and instead, "at the most" she had three positive results — was not credible. *Id*.

The trial court also considered Mother's testimony that she participated in daily reporting through probation and the criminal court, and that she sometimes tested negative in the morning with probation but positive later that same day with the "color call in system." *Id*. at 17. The court similarly noted, however, that Mother did not produce any records showing inconsistent test results on the same day. The court found Mother's testimony was not

_____

[10] The trial court acknowledged that on the day after the January 2023 hearing, Mother complied with the court's direction to submit to a drug screen, and that result was negative. *See* Trial Court Opinion, 5/4/24, at 10-11.

credible, and Jones and Hockenbury, were credible. *See id*. at 18, 21. The trial court concluded that CYS presented credible testimony "that Mother did not complete nor benefit from the services addressing her substance abuse issue due to her continued incapacity to achieve sobriety." *Id*. at 5.

After our review, we determine the trial court's findings of fact are supported by the record, and it did not commit any abuse of discretion. *See Interest of K.T.*, ___ A.3d at ___, 2024 WL 4194774 at *5. Mother's arguments, concerning her visits with the Children and parenting classes, are not persuasive, as the trial court did not make any findings against her in this regard. Indeed, the trial court found that Mother completed the required parenting class — her complaints against CYS notwithstanding.

On the other hand, the trial court found Mother failed to remedy the issue that caused the Children's placement — to complete or "benefit from the services addressing her substance abuse issue due to her continued incapacity to achieve sobriety." Trial Court Opinion, 5/4/24, at 5. The trial court considered Mother's testimony — which she reiterates on appeal — that the drug testing conflicted with her work schedule, she lacked transportation to arrive timely at the testing site, and CYS knew she was compliant with her probation drug testing. *See id*. at 11, 18. However, the trial court found this testimony not credible, and on appeal, we do not disturb these findings, nor reweigh the competing testimony in Mother's favor. *See Interest of K.T.*, ___ A.3d at ___, 2024 WL 4194774 at *5. Furthermore, Mother does not

dispute that she did not present documentation in support of her testimony. Contrary to Mother's claim, the trial court did consider her desire to participate in the residential Gaudenzia program with the Children. *See* Trial Court Opinion, 5/4/24, at 11, 13-14, 18-19. However, the trial court credited Jones' opinion that Mother's motivation was only to be reunited with the Children, but Mother should first remedy her substance abuse issue. *See id*. at 11. Mother did not dispute Jones' testimony that she failed to participate in the follow-up drug evaluation in January 2022. *See id*. at 7. While Mother testified at the March 2023 hearing that she had been in drug treatment with Robinson Counseling Center since November 2021, Jones testified that she had not signed a release, and in any event, Mother did present any supporting documentation. Jones did not obtain a release until December 2023 — sixteen months after Mother allegedly engaged in counseling. In any event, the trial court credited and considered the testimony that as of her last two "color call in system" tests in September 2022 — three years after the Children were placed — Mother continued to test positive for fentanyl. *See* Trial Court Opinion, 5/4/24, at 16. Finally, Mother does not dispute Jones' testimony that after September 2022, she failed to comply at all with the "color call in system."

To the extent Mother claims the record supports a showing that she achieved "continued and long-lasting victory over [her] addiction," we disagree. Mother's Brief at 17. At the time Mother entered a rehabilitation

program in April 2023, three years and five months had elapsed since the Children were taken into protective custody, and almost eleven months since CYS filed the termination petition. Although subsection 2511(a)(2) does not set forth a time period in which a parent must remedy the incapacity or refusal that caused a child to be without essential parental care, our decisional authority requires a parent "to make diligent efforts toward the **reasonably prompt** assumption of full parental duties." **Interest of K.T.**, ___ A.3d at ___, 2024 WL 4194774 at *6 (emphasis in original).

In light of all the foregoing, we conclude the trial court did not abuse its determination in finding CYS presented clear and convincing evidence that Mother's conduct satisfied the grounds for termination under subsection 2511(a)(2). **See Interest of K.T.**, ___ A.3d at ___, 2024 WL 4194774 at *5. Because we agree with the trial court as to this subsection, we need not reach the merits of Mother's arguments concerning subsection 2511(a)(8). **See id**. We conclude no relief is due on Mother's first issue.

In her second issue, Mother asserts the trial court abused its discretion in finding grounds for termination under subsection 2511(b). We reiterate that we review a termination decree for an abuse of discretion. **See Interest of K.T.**, ___ A.3d at ___, 2024 WL 4194774 at *5. As noted above:

> Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [subsection] 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the

emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*Id*.

Subsection 2511(b) states:

The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. . . .

23 Pa.C.S.A. § 2511(b).

[A] court conducting the [subs]ection 2511(b) needs and welfare analysis must consider more than proof of an adverse or detrimental impact from severance of the parental bond. We emphasize analysis of the parental bond is but one part of the overall subsection (b) analysis, which includes a determination of whether the bond is necessary and beneficial to the child, *i.e.*, whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare.

*Interest of K.T.*, ___ A.3d at ___, 2024 WL 4194774 at **10-11 (citation omitted). "'In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship.' The court is not required to use expert testimony, and social workers and caseworkers may offer evaluations as well." *In re M.P.*, 204 A.3d 976, 983 (Pa. Super. 2019) (citations omitted).

Mother avers that she and the Children have a bond. She maintains that she has demonstrated that she loves and "would do anything for" the

Children, that the Children love her, are bonded with her, and enjoy their visits, and that she should continue to be a part of their lives. Mother's Brief at 20, 21. In support, Mother cites "a moment in Court, acknowledged by the judge, where the [C]hildren were given stuffed animals by the judge and then looked out to Mother, not the foster mother or a case worker, to be directed to say[] 'thank you' for the gift." *Id*. at 16 (unnecessary capitalization omitted). Mother also asserts there was no evidence presented of how termination would affect the Children. *See id*. at 22. Mother acknowledges D.R.H.'s *in camera* statement to the trial court that "she wanted to be adopted so long as she could see Mother when she [was] older," but maintains this statement was "an obvious result of coaching." *Id*.

The trial court found:

[CYS] presented credible testimony regarding the needs, welfare and best interest of the [C]hildren . . . in relation to . . . Mother. Jones testified that the [C]hildren have been in foster care since October 2019. [T]he foster home is comprised of the foster parents and their . . . adult daughter and . . . minor son. Jones testified that the [C]hildren have assimilated into the family [and] are involved with all family activities, in addition to attending functions with the extended family members. [N.T., 4/10/23, at 6-7. The C]hildren referred to the foster parents as " Mommy" and " Daddy." *Id*. at 7

Jones stated that the foster parents meet the [C]hildren's physical needs[, and] have adequate food and clothing for the [C]hildren. The foster parents also meet the [C]hildren's developmental needs by providing them with age-appropriate activities. In addition, both [Children] attend school, and the foster parents are proud of their achievements[ and] provide encouragement to the [C]hildren in school. Jones indicated that the foster parents meet the emotional needs of the [Children] by comforting [them] when

they're upset and giving them praise for their achievements. ***Id.***
. . .

Jones stated that the foster parents wish to adopt the [C]hildren.
. . . Jones described the bond between the foster parents and the
[C]hildren as a parent/child bond. Jones described the [C]hildren
as being very accustomed in their home, and the [C]hildren
further stated to her that they wish to reside with the foster
parents. Jones indicated that the bond is reciprocated by the
[C]hildren.

With respect to the bond between the [C]hildren and [M]other,
Jones indicated that the [C]hildren are familiar with [M]other.
[Jones] believed that the [C]hildren love [M]other and enjoy
seeing her; however, she would not describe their relationship as
a parent/child bond. Jones stated that she did not find Mother
consistent with performing parental duties for the majority of the
[C]hildren's lifetime. ***Id***. at 7-9.

Jones believed that the termination of [Mother's] parental rights
would not have any negative or detrimental effect upon the
[C]hildren. In fact, Jones believe[d] that the adoption would be
in the [C]hildren's best interest. ***Id***. at 9. . . .

Trial Court Opinion, 5/4/24, at 23-24 (paragraph break added).

The trial court also considered the testimony of Coburn, the Children's

CASA, that she observed the Children in the foster home and found they had

"a positive attitude, are happy[,] and follow instructions." ***Id***. at 25. Coburn

"attempted to contact [M]other multiple times; however, she was unable to

reach her." ***Id***. (*citing* N.T., 1/26/23, at 43). Again, the trial court found the

testimony presented by CYS was credible. Trial Court Opinion, 5/4/24, at 23.

After our review, we determine the trial court's findings of fact are

supported by the record, and it did not commit any abuse of discretion. ***See***

***Interest of K.T.***, ____ A.3d at ____, 2024 WL 4194774 at *5. The trial court

- 25 -

credited Jones' testimony that while Mother and the Children had a bond, it was not a parent/child bond. Although Mother emphasizes the incident in the courtroom, in which the trial judge presented the Children with gifts and the Children "looked out to Mother, not the foster mother or a case worker, to be directed to say[] 'thank you,'" it is not this Court's role to reweigh this evidence against the other testimony and evidence presented. ***See id***. Furthermore, Mother provides no support for her assertion that D.R.H.'s *in camera* statements was "an obvious result of coaching." Mother's Brief at 22. In any event, the trial court opinion did not address the *in camera* statement the record does not indicate what weight, if any, the court attributed to it. In light of the foregoing, we do not disturb the trial court's finding that CYS met its burden of proof in showing termination was proper under subsection 2511(b).

For the foregoing reasons, we affirm the orders of the trial court terminating Mother's parental rights to D.R.H. and A.L.C.

Orders affirmed.

Judgment Entered.

_____
Benjamin D. Kohler, Esq.
Prothonotary

Date: 11/05/2024

- 26 -